CV 15                5486

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DEARIE, J.
LEVY, M.J.

FILED
CLERK

2015 SEP 22  PM 2: 44

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

---------------------------------------------------------------- X

UNITED STATES OF AMERICA *Ex rel.*
DANIEL MOY,

                              Plaintiff,

              -against-

A C PHARMACY CORP., JENNAN
COMPREHENSIVE MEDICAL, P.C., MAGGIE
CHEN, AMANDA Y. HON, JOHN HON, SI CI
ZHU, JOHN DZAAN-HONG CHING, WISELY
LIU, FLORENCE MUI, HENRY CHEN, M.D.,
YANHAN HUANG, M.D., JOHN YIU, M.D.,
TINA WONG, M.D., PUI-CHING MAK, QING
XIANG HUANG, XING LIAN CHEN, JACKY
LEE, and RICHARD SHADRIN,

                           Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**FILED *IN CAMERA* AND
UNDER SEAL**

**COMPLAINT PURSUANT TO
FEDERAL AND STATE FALSE
CLAIMS ACTS FOR
HEALTHCARE FRAUD**

**JURY TRIAL DEMANDED**

---------------------------------------------------------------- X

       Plaintiff, United States of America, by and through *qui tam* relator Daniel Moy

("Plaintiff", "Mr. Moy" or "Relator"), by and through his attorneys, Allegaert Berger & Vogel

LLP, brings this action pursuant to 31 U.S.C. § 3729, *et seq.*, (the "False Claims Act") and under

the New York State Finance Law, Article 13 (the "New York False Claims Act"), to recover all

damages and to seek all appropriate penalties and other remedies available to and on behalf of

the United States of America, from and against defendants A C Pharmacy Corp., Jennan

Comprehensive Medical, P.C., Amanda Y. Hon, R.Ph., John Hon, Si Ci Zhu, John Dzaan-Hong

Ching, R.Ph., Maggie Chen, Wisely Liu, Florence Mui, R.Ph., Henry Chen, M.D., Yanhan

Huang, M.D., John Yiu, M.D., Tina Wong, M.D., Pui-Ching Mak, Qing Xiang Huang, Xing

Lian Chen, Jacky Lee, and Richard Shadrin (collectively, "Defendants").  Relator makes these

allegations on personal knowledge as to his own acts and status and either on personal

knowledge or information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This action arises from a nefarious and brazen scheme perpetrated by

Defendants to fleece the Medicare and Medicaid programs out of millions of dollars in

fraudulent billings.  Relator, a former part-time pharmacist at Defendant A C Pharmacy Corp.

("AC Pharmacy"), personally discovered this fraudulent scheme and made it his mission to

compile comprehensive evidence to expose and prove it, which evidence serves as the basis for

this Complaint.  Although broad in scope and implementation, Defendants' scheme is strikingly

simple: to have AC Pharmacy fraudulently bill the Medicare and Medicaid programs for as many

prescriptions as possible to unlawfully reap millions of dollars in pharmacy "reimbursement"

fees for presumably dispensing medications that are largely unnecessary and in most cases never

even filled.

2.     Defendants' scheme is perpetrated in several ways.

3.     Chiefly, Defendant Jennan Comprehensive Medical, P.C. ("Jennan")

writes unnecessary prescriptions for patients (likely also billing the Medicare and Medicaid

programs for their unnecessary medical appointments) presumably to be dispensed at AC

Pharmacy, which is conveniently located next-door in the same building as one of Jennan's

offices.  AC Pharmacy then submits these bogus prescriptions to the Medicare and Medicaid

programs for approval and payment.  But AC Pharmacy never actually dispenses the medications

called for by these prescriptions.  Thus, Defendants maximize the fruits of their fraud as AC

Pharmacy's "reimbursement" by these government programs amounts to sums that take into

account both a pharmacy dispensing or service fee as well as the ostensible cost of the

2

medication to the pharmacy, a cost that AC Pharmacy never incurs. These bogus prescriptions are then automatically "refilled" as frequently as possible, thereby compounding exponentially the damages to the Medicare and Medicaid programs.

4.      Circled in the photograph below, taken by Relator in September 2014, are actual bogus prescriptions that were generated in just several days: -- all of which were billed to health insurers, including primarily, the Medicare and Medicaid programs -- but never actually filled. This is evidenced by the fact that the adhesive label for each prescription remained on the label page and was never affixed to a vial or medication container.



5.      Defendants also routinely -- and in blatant violation of governing anti-kickback statutes -- provide a range of incentives to other patients to have them fill what otherwise may be legitimately prescribed prescriptions at AC Pharmacy, including by:

- Submitting on patients' behalf bogus reimbursement forms, to generate checks sent directly to patients, for over-the-counter ("OTC") products never actually purchased from AC Pharmacy;
- Giving patients cash-like "coupons", which entitle the bearer to purchase goods at a local supermarket; and
- Providing patients free handouts of everything from newspapers to medical supplies.

6.      By submitting prescriptions illegally procured from Medicare and Medicaid recipients by virtue of these illegal kickbacks, such claims are per se fraudulent under both the Federal and New York False Claims Acts.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), and 31 U.S.C. § 3732(a) which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court also has supplemental jurisdiction with respect to the claims asserted herein under state law as such arise out of a common nucleus of operative fact.

8.      There have been no public disclosures of the allegations or transactions detailed herein that would bar jurisdiction under 31 U.S.C. § 3730(e).

9.      This Court has personal jurisdiction over all Defendants because they are located or reside within the Eastern District of New York and act as providers of healthcare services and products to federal and state healthcare program beneficiaries, including Medicare and Medicaid beneficiaries, within the Eastern District of New York. Each Defendant regularly performs healthcare services and submits claims for payment to federal and state healthcare

programs, including, but not limited to, Medicare and Medicaid, and accordingly, is subject to the jurisdiction of this Court.

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), (c), and 31 U.S.C. § 3732(a) because Defendants transact business or reside within this District and the facts forming the basis of this Complaint occurred within this District.

## THE PARTIES

### Relator

11.     Relator Daniel Moy is a resident of the State of New York and a citizen of the United States. Mr. Moy has been a New York licensed pharmacist for more than 41 years. After receiving his pharmacy license in 1974, Mr. Moy worked as a staff pharmacist, supervising pharmacist, and assistant director of pharmacy at New York Methodist Hospital for some 11 years. He later owned and operated his own retail pharmacy in Manhattan, worked as a staff pharmacist at Pathmark Stores, Inc., a supervising pharmacist at Duane Reade, and as a staff pharmacist at Stonebridge Pharmacy. Mr. Moy was also employed as a part-time pharmacist (two days each week) at AC Pharmacy from in or around July, 2013, until sometime in April, 2015.

### Corporate Defendants

12.     Defendant AC Pharmacy is a New York corporation with its principal place of business at 762 59th Street, Brooklyn, New York 11220.

13.     Defendant Jennan is a New York corporation with its principal place of business at 762 59th Street, Brooklyn, New York 11220.

### AC Pharmacy Defendants

14.     Defendant Amanda Y. Hon is a co-owner of AC Pharmacy and resides at 2265 60th Street, Brooklyn, New York 11204. Ms. Hon is a New York licensed pharmacist.

Ms. Hon uses a variety of English and Chinese names including, but not limited to, Amanda Hund and Amanda Yan Hon.

15.    Defendant John Hon, resides at 2265 60th Street, Brooklyn, New York 11204, is Amanda Y. Hon's husband, and participates in the management of AC Pharmacy and the fraudulent scheme detailed herein.

16.    Defendant Si Ci Zhu is the Chief Executive Officer and co-owner of AC Pharmacy, and resides in Brooklyn, New York.

17.    Defendant John Dzaan-Hong Ching, resides in Brooklyn, New York and is Defendant Si Ci Zhu's husband. Mr. Ching is a New York licensed pharmacist and was involved in hiring Relator. Mr. Ching is also the sole proprietor of Grand Buy Pharmacy, Inc. ("Grand Buy Pharmacy") located some 12 blocks from AC Pharmacy at 4721A 8th Avenue, Brooklyn, New York 11220. Based on Mr. Ching's conduct with respect to the unlawful acts alleged herein with respect to AC Pharmacy, there is a more than reasonable inference that Defendant Ching also perpetrates fraud on the Medicare and Medicaid programs through Grand Buy Pharmacy. Accordingly, subject to further investigation and discovery, Relator reserves all rights to amend this complaint and/or to otherwise assert appropriate claims against Grand Buy Pharmacy.

18.    Defendant Maggie Chen is a co-owner of AC Pharmacy and also works at Jennan. Ms. Chen also uses the Chinese name Jian Ai Chen. Ms. Chen resides at 638 54 Street, 1st Floor, Brooklyn, New York.

19.    Defendant Wisely Liu is Maggie Chen's husband, owns and is employed by AC Pharmacy, and/or holds himself out as an agent of AC Pharmacy. Defendant Liu resides at 365 Westminster Road, #3D, Brooklyn, New York.

6

20.     Defendant Florence Mui is a licensed pharmacist employed at AC Pharmacy as a supervising pharmacist.  She resides at 2082 East 53rd Street, Brooklyn, New York 11234.

**Jennan Defendants**

21.     Defendant Henry Chen, M.D., is the Chief Executive Officer and owner of Jennan.  Defendant Chen resides in New Jersey.

22.     Defendant Yanhan Huang, M.D., is employed at Jennan.  Defendant Huang resides in Brooklyn, New York.

23.     Defendant John Yiu, M.D., is employed at Jennan.  Defendant John Yiu resides in Staten Island, New York.

24.     Defendant Tina Wong, M.D., is employed at Jennan and resides in Brooklyn, New York,

25.     Defendant Pui-Ching Mak is a nurse practitioner employed at Jennan and resides in Brooklyn, New York.

26.     Defendant Qing Xiang Huang is a nurse practitioner employed at Jennan and resides in Brooklyn, New York.

27.     Defendant Xing Lian Chen is a nurse practitioner employed at Jennan and resides in Brooklyn, New York.

28.     The term "Jennan Defendants" refers to, collectively, Jennan and Defendants Dr. Chen, Dr. Huang, Dr. Yiu, Dr. Wong, Pui-Ching Mak, Qing Xiang Huang, Xing Lian Chen.

## Other Defendants

29.     Jacky Lee is a Senior Medicare Benefit Consultant at WellCare Health Plans, Inc. ("WellCare"). WellCare provides, among other things, managed care health plans for Medicaid and Medicare recipients in New York. Mr. Lee resides in Brooklyn, New York.

30.     Defendant Richard Shadrin was employed by M.A. Surgical Supplies, Inc. ("MA Surgical Supplies"), located in Brooklyn, New York and Caremore Consulting, Inc. ("Caremore Consulting"), also in Brooklyn, New York, at relevant times. Based on Defendant Shadrin's conduct with respect to the unlawful acts alleged herein with respect to AC Pharmacy, it can be inferred that MA Surgical Supplies and/or Caremore Consulting participated and benefited from Shadrin's payment of kickbacks to the other Defendants. Accordingly, subject to further investigation and discovery, Relator reserves all rights to amend this complaint and/or to otherwise assert appropriate claims against MA Surgical Supplies and Caremore Consulting.

## LEGAL BACKGROUND

### The Federal False Claim Act

31.     The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

32.     As relevant here, the False Claims Act establishes treble damages liability to the United States for an individual or entity that:

8

(i)     "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C.A. § 3729(a)(1)(A);

(ii)    "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C.A. § 3729(a)(1)(B); or

(iii)   "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," 31 U.S.C.A. § 3729(a)(1)(C).

"Knowing," within the meaning of the False Claims Act, is defined to include reckless disregard and deliberate indifference. 31 U.S.C.A. § 3729(b)(1).

## New York State False Claims Act

33.     The State of New York adopted its False Claims Act in 2007. The New York False Claims Act is closely modeled after the federal statute and similarly provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to state or local government, in New York State for payment or approval, is liable for civil penalties plus three times the amount of the damages sustained by the state or local governments.

## Federal and New York Anti-Kickback Statutes

34.     The Federal Health Care Program Anti-Kickback Statute, enacted as Section 1128(b) of the Social Security Act, 42 U.S.C. § 1320a-7b(b), makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) to any person to induce the purchase of a medication that is covered by a federal healthcare program. Under the statute, remuneration includes transfers of items or services for free or for other than fair market value. The statute further prohibits knowingly and willfully soliciting or receiving any remuneration in return for purchasing or recommending purchasing a medication covered by a federal healthcare program. As such, the statute forbids any of offering, paying, soliciting, or receiving kickbacks in exchange for purchasing medications covered by federal healthcare programs.

9

35.     In 2010, the federal Anti-Kickback Statute was amended, effective

January 1, 2011, to clarify that any claim for products or services that violates the Anti-Kickback

Statute also violates the False Claims Act. 42 U.S.C.A. § 1320a-7b(g) ("a claim that includes

items or services resulting from a violation of this section constitutes a false or fraudulent claim

for purposes of [the False Claims Act]").

36.     New York's anti-kickback statute similarly provides that, "[n]o medical

assistance provider shall:

> (a) solicit, receive, accept or agree to receive or accept any
> payment or other consideration in any form from another person to
> the extent such payment or other consideration is given: (i) for the
> referral of services for which payment is made under title eleven
> of article five of this chapter; or (ii) to purchase, lease or order any
> good, facility, service or item for which payment is made under
> title eleven of article five of this chapter; or
>
> (b) offer, agree to give or give any payment or other consideration
> in any form to another person to the extent such payment or other
> consideration is given: (i) for the referral of services for which
> payment is made under title eleven of article five of this chapter; or
> (ii) to purchase, lease or order any good, facility, service or item
> for which payment is made under title eleven of article five of this
> chapter [.]

N.Y. Soc. Serv. Law § 366-d(2). A medical assistance provider under New York state's anti-

kickback statute is "any person, firm, partnership, group, association, fiduciary, employer or

representative thereof or other entity who is furnishing care, services or supplies under" the New

York Medicaid program, *id.* § 366-d(1), as does AC Pharmacy.

### The Medicare Program

37.     Medicare is a federal program that provides subsidized health insurance

for persons who are 65 years of age or older or are disabled. *See* 42 U.S.C. §§ 1395, *et seq.*

("Medicare"). Medicare Part D, enacted in 2003, provides prescription medication benefits for

Medicare beneficiaries. *See* Medicare Prescription Drug, Improvement, and Modernization Act

of 2003, Pub. L. No. 108-173. All Medicare Part A and Part B beneficiaries are eligible to enroll

in a prescription medication plan under Part D.

38.    Medicare enters into provider agreements with providers and suppliers,

including pharmacies, as part of enrolling these providers and suppliers into the program. To be

eligible to participate, pharmacies must certify that they:

> Agree to abide by the Social Security Act and all applicable
> Medicare laws, regulations and program instructions that apply to
> this supplier. . . . I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal anti-
> kickback statute and the Stark law), and on the suppliers
> compliance with all applicable conditions of participation in
> Medicare.

39.    For Medicare Part D, the United States Department of Health and Human

Services ("HHS"), through the Centers for Medicare and Medicaid Services ("CMS"), contracts

with private insurance companies to administer the prescription plans ("Part D Sponsors", and

together with the Medicaid Managed Care Organizations, defined below, the "Sponsors"). The

Part D Sponsors are subsidized by CMS under annual renewable contracts. The Part D Sponsors

enter into subcontracts with pharmacies, such as AC Pharmacy, to provide medications to

Medicare Part D beneficiaries enrolled in the Part D Sponsor's plan.

40.    When pharmacies dispense medications to Part D beneficiaries, they do so

by submitting claims electronically to the beneficiary's Part D Sponsor (sometimes through an

intermediary called a pharmacy benefits manager or "PBM"). The Plan D Sponsor then pays the

pharmacy for the portion of the medication cost covered under the plan.

41.    The Plan D Sponsors use the electronic claims information to submit an

electronic notification to CMS of a "Prescription Drug Event" (each, a "PDE Claim").

Submission of PDE Claims is essential to the administration of Part D Plans, and is also a

condition of payment for CMS's provision of Medicare funds to Part D Sponsors. *See* 42 C.F.R. § 423.322.

42. Under Part D, CMS pays each Part D Sponsor a monthly payment to subsidize each enrollee, estimated reinsurance amounts for catastrophic coverage, and estimated low-income subsidies. *See* 42 C.F.R. §§ 423.315, 423.329. At year end, CMS reconciles the amounts actually paid to each Plan D Sponsor and the amounts paid out on behalf of the sponsor's beneficiaries. To perform this reconciliation, CMS relies on the PDE Claims to determine the amounts actually paid by Part D Sponsors. If CMS determines that it underpaid a Plan D Sponsor, CMS will pay additional amounts to the sponsor. Alternatively, if CMS determines that a Plan D Sponsor was overpaid, relative to the amounts actually paid out by the sponsor, CMS will recoup some of the prior payments to the sponsor. Payments made by CMS to the Plan D Sponsors come from the "Medicare Prescription Drug Account", an account within the "Federal Supplemental Medical Insurance Trust Fund". *See* 42 C.F.R. § 423.315.

43. In order to receive Part D funds from CMS, the Part D Sponsors and their authorized subcontractors (including pharmacies, such as AC Pharmacy), are required to comply with all applicable federal laws, regulations, and CMS instructions. Accordingly, all contracts between CMS and Part D Sponsors contain provisions requiring the Part D Sponsors to comply with all federal laws.

44. CMS regulations require that all subcontracts between Part D Sponsors and downstream entities, including pharmacies, contain language that the downstream entities must comply with all applicable federal law, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

12

45.     CMS regulations also require that Part D Sponsors certify the accuracy, completeness, and truthfulness of the PDE claims data submitted to CMS. *See* 42 C.F.R. § 43.50(k).  Compliance with this requirement is a condition of payment under Part D.

46.     CMS regulations further provide that all downstream entities, including pharmacies, must also certify the accuracy of any PDE Claims data they provide to the Part D Sponsors:

> If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify ... the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(3).

### The Medicaid Program

47.     Medicaid is a jointly funded federal and state program that provides healthcare benefits for certain persons, primarily the poor and disabled.  Federal support for Medicaid is significant.  For example, the federal government provides approximately 50% of the funding for New York Medicaid with the remainder being received from the state and local governments -- for example, in the case of those Medicaid beneficiaries located in New York City, the State of New York and New York City share funding obligations for those Medicaid expenses not covered by the federal government.

48.     Under traditional "fee-for-service" Medicaid pharmacies and other healthcare providers submit claims directly to the relevant state Medicaid agency's fiscal intermediary, which intermediary then pays the claims according to that state's approved Medicaid covered medication payment schedule.  Federal laws and regulations limit Medicaid payments to those for reasonable and necessary services.

13

49.    In addition to traditional Medicaid, the State of New York contracts with private insurance companies ("Medicaid Managed Care Organizations") to administer healthcare plans, which include pharmacy benefits, for Medicaid eligible beneficiaries ("Medicaid Plans"). All costs incurred on behalf of beneficiaries enrolled in the Medicaid Plans are directly passed through to the federal, state and local governments.

50.    A pharmacy or other healthcare provider who participates in the New York Medicaid program must certify annually that:

> I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations.
>
> ETIN Certification Statement for New Enrollments - form #490602 (08/14).

51.    To be eligible for payment under New York Medicaid a pharmacy or other participating healthcare provider must also certify the following statement, written in all capital letters:

> ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO MATERIAL FACT HAS BEEN OMITTED; I UNDERSTAND THAT PAYMENT AND SATISFACTION OF THIS CLAIM WILL BE FROM FEDERAL, STATE AND LOCAL PUBLIC FUNDS AND THAT I MAY BE FINED AND/OR PROSECUTED UNDER APPLICABLE FEDERAL AND STATE LAWS FOR ANY VIOLATION OF THE TERMS OF THIS CERTIFICATION, INCLUDING BUT NOT LIMITED TO FALSE CLAIMS, STATEMENTS OR DOCUMENTS, OR CONCEALMENT OF A MATERIAL FACT
>
> *Id.*

## FACTS GIVING RISE TO THE COMPLAINT

### AC Pharmacy and Jennan

52.    AC Pharmacy is an independent retail pharmacy of about 400 square feet located on the ground floor of 762 59th Street, in Brooklyn's "Chinatown" in the Sunset Park neighborhood. Within the 400 square feet of space, AC Pharmacy has installed no fewer than eight surveillance cameras. AC Pharmacy has one cash register. Typically, AC Pharmacy has only one pharmacist on duty at a time. Also AC Pharmacy pays at least nine no-show "employees" who in reality do no work at all for AC Pharmacy. These fictitious employees -- Mei Ling Hon, Yook Lin Choong, Xiao Ying Chen, Xiao Yun Yuen, Ying Tat Ko, Yifan Chen, Yue Xian Li, Jian Wei Chen, and Chunhua Lao -- are recipients of Defendants' ill-gotten gains.

53.    AC Pharmacy shares the same ground floor with a clinic operated by Jennan and the Jennan Defendants, and Jennan patients are frequently directed to AC Pharmacy to fill their prescriptions. Despite its small size, AC Pharmacy apparently dispenses -- or at least has claims to dispense -- more than $10 million worth of prescriptions annually.

54.    The precise ownership of AC Pharmacy is not presently known. Relator, however, has observed that Defendants Amanda Y. Hon, John Hon, Si Ci Zhu and Maggie Chen all attended regular "owners" meetings held at the pharmacy and all of them directly participate in managing AC Pharmacy's affairs.

55.    Defendants Maggie Chen, Si Ci Zhu, and Amanda Hon regularly manage and supervise AC Pharmacy's day-to-day operations.

56.    Defendant Wiseley Liu is Defendant Maggie Chen's husband. Defendant Liu identified himself as an owner of AC Pharmacy to Relator, and actively participates in the scheme detailed herein, including by, among other things, allowing bogus prescriptions to be billed to his health insurer for medications that he never received, with the premiums for his

15

health insurance being paid by AC Pharmacy. Defendant Liu has use of a credit card which is billed to AC Pharmacy but which he uses for his and Defendant Maggie Chen's personal expenses.

57.     Defendant Si Ci Zhu's husband, John Ching, is a licensed pharmacist who interviewed and hired Relator for his job at AC Pharmacy.

58.     Defendant Amanda Hon's husband, John Hon, regularly attends owners' meetings at AC Pharmacy and is actively involved in the pharmacy's management, including, for example, by assisting AC Pharmacy in connection with at least one audit by a commercial third party administrator on or about March 24, 2015.

59.     Jennan's precise ownership is also not presently known. Defendant Henry Chen holds himself out as its "Chief Executive Officer" and Jennan also employs Defendants Yanhan Huang, M.D., John Yiu, M.D., Tina Wong, M.D., Pui-Ching Mak, NP-C., Qing Xiang Huang, FNP., and Xing Lian Chen, FNP. It is not known whether or which of these individuals have an ownership interest in Jennan.

60.     Defendant Maggie Chen is the chief conduit between AC Pharmacy and Jennan and a main player in Defendants' scheme. Although she has an ownership interest in AC Pharmacy where she also serves as a manager, Defendant Maggie Chen receives no salary from AC Pharmacy. Ironically, and to further steal from the Medicaid program, she herself is a Medicaid recipient. At Jennan, Defendant Maggie Chen acts as a manager but without any formal title.

### AC Pharmacy Billing Practices

61.     Approximately 95% of the medications dispensed by AC Pharmacy are billed either to Medicaid directly or, indirectly to Medicare and Medicaid, through billings to Sponsors.

62.    AC Pharmacy submits these claims electronically via its "MicroMerchant" system, a comprehensive pharmacy software system that allows for prescription management, claims submission, and revenue and expense tracking.

63.    Among other things, MicroMerchant requires the operator to enter a billing code ("Billing Code") identifying the entity to be billed for each prescription. This Billing Code can refer to Medicaid (for direct Medicaid billings), a Sponsor, or a PBM, which, in this last case, processes the billing and remits the prescription to the appropriate Sponsor for payment to AC Pharmacy.

64.    The Billing Codes are electronically associated with the prescriptions and printed on labeling to be affixed to medications, together with other information, such as authorization number, prescription number, the amount of the patient's co-pay, and the amount billed to Medicaid or the Sponsor (either directly or through a PBM).

65.    By accessing information through this electronic system, Relator was able to track down not only which medications were being fraudulently billed, but in many cases was also able to identify the specific entity being defrauded.

66.    The image below is from a computer report generated by Relator through AC Pharmacy's MicroMerchant system on or about December 21, 2014. This document lists the Billing Code for all of the prescriptions that AC Pharmacy presumably dispensed on December 15, 2014.

| Ins-Type | | Original | Refills | Total Rxs |
|---|---|---|---|---|
| AC1 | 610097 | 12 | 58 | 70 |
| AD1 | 004336 | 60 | 215 | 275 |
| ADV | 004336 | 0 | 8 | 8 |
| ADV1 | 004336 | 37 | 174 | 211 |
| AE1 | 610502 | 0 | 4 | 4 |
| AG4 | 012353 | 18 | 25 | 43 |
| AMC | 610494 | 7 | 47 | 54 |
| BSBC2 | 610239 | 3 | 0 | 3 |
| C | | 3 | 1 | 4 |
| EMB | 400023 | 3 | 0 | 3 |
| ES1 | 003858 | 2 | 20 | 22 |
| HIP2 | 015748 | 0 | 7 | 7 |
| HIP4 | 015748 | 0 | 2 | 2 |
| HTH | 610011 | 3 | 10 | 13 |
| HUM2 | 015581 | 8 | 6 | 14 |
| IN2 | 610127 | 2 | 0 | 2 |
| MCD | 004740 | 39 | 118 | 157 |
| MX1 | 012312 | 0 | 3 | 3 |
| PA2 | 610014 | 2 | 28 | 30 |
| PAI | 610014 | 0 | 1 | 1 |
| WHP | 603286 | 8 | 27 | 35 |
| WHP2 | 603286 | 33 | 210 | 243 |
| **Grand Totals** | | 240 | 964 | 1204 |

67.    According to this report, based on AC Pharmacy's own data, AC Pharmacy purported to fill 1,204 prescriptions on December 15, 2014, generating more than $90,000 in billings to Medicaid and Sponsors -- an absurdly high amount of billings for a pharmacy of the size and staffing capacity of AC Pharmacy. *See* below at ¶ 75.

68.    Each of the Billing Codes, identified above under "Ins-Type", identifies the entity billed, either Medicaid, a PBM, a Sponsor, a private insurer, or in the case of Billing Code "C", patients who paid the full price of the medication dispensed.

69.    Associated with each Billing Code, and identified immediately to the right of the Billing Codes above, is a six digit "BIN" number used to route the prescription to the appropriate payor.

70.    The code "MCD" is used for to those prescriptions sent directly to Medicaid for reimbursement. The BIN number for Medicaid is "004740". On December 15, 2014, alone, AC Pharmacy billed 157 prescriptions directly to Medicaid.

71.    The Billing Codes "AC1", "AD1", "ADV", and "ADV1" all refer to CVS Caremark ("Caremark"). Caremark is a PBM that administers pharmacy claims for a number of Part D Sponsors and Medicaid Managed Care Organizations, and Caremark itself owns and operates a Part D Sponsor under the name Silver Script. Each of these Billing Codes have an identical BIN number, "004336". Each of these Billing Codes are used to bill Part D Sponsors or Medicaid Managed Care Organizations for which Caremark acts as either PBM or Sponsor. Thus, any prescription associated with one of these Billing Codes was ultimately paid for with Medicaid or Medicare funds.

72.    The Billing Codes "WHP" and "WHP2" refer to "WellCare". Each of these Billing Codes have an identical BIN number, "603286". WellCare owns and operates both a Part D Sponsor and a Medicaid Managed Care Organization. Both of these Billing Codes are used to bill to Medicaid or Medicare Part D, through WellCare. Any prescription associated with either of these Billing Codes was ultimately paid for with Medicaid or Medicare funds.

## Bogus Prescriptions

73.    The primary component of Defendants' scheme, described in detail below, is simple and brazen: Defendant Jennan issues bogus prescriptions which AC Pharmacy then submits to the Medicare and Medicaid programs for approval and payment, without ever actually dispensing the medications.

### AC Pharmacy's Extraordinary Revenues

74.    In order to grasp the relative magnitude of Defendants' fraud, it is important to note that the pharmacy itself is extraordinarily small. Although AC Pharmacy's

19

total physical space is approximately 400 square feet, it dispenses -- or at least bills for -- some $10 million in prescription medications each year, an amount that vastly exceeds the annual pharmacy sales of large chain pharmacies, including those where Relator has been employed.

75. AC Pharmacy purportedly dispenses as many as 1,200 prescriptions daily -- a feat that is virtually impossible given the space and small number of its employees. In particular, AC Pharmacy purports to have accomplished this feat while only one pharmacist, Defendant Mui, was on duty. Thus, even assuming that Defendant Mui worked for ten hours straight without a single break, she would have needed to verify and dispense one prescription every 30 seconds. There is simply no way that she -- or any other pharmacist -- could possibly have accomplished this.

76. Defendants perpetrate their scheme rain or shine. On January 8, 2014, one of the coldest New York days on record, when the temperatures in Brooklyn were in the single digits, AC Pharmacy purportedly dispensed 1,165 prescriptions, generating more than $90,000 in revenue. This was more than three times the daily number of prescriptions ordinarily "dispensed" by AC Pharmacy -- on a day foot traffic would have been expected to decline substantially due to the dangerously cold weather -- as shown by the following chart, generated by Relator from information on AC Pharmacy's computer system, which depicts the number of prescriptions dispensed during the period between January 2, 2014 through January 18, 2014:



77.    While AC Pharmacy's team of extraordinary, super-charged pharmacists seem to defy the laws of physics, no less extraordinary is AC Pharmacy's apparent ability to defy basic principles of economics. Indeed, for a business to be sustainable, its revenue must exceed its costs. In AC Pharmacy's case, its ostensibly high dispensing rate means that AC Pharmacy necessarily has to purchase an extremely large amount of the medications to fill these prescriptions. However, its revenue is regularly but a fraction of these costs, meaning that if AC Pharmacy in fact paid for the medications for which it bills the government programs -- which it does not -- it would be broke.

78.    For example, in June, 2013, AC Pharmacy purportedly dispensed more than $1.3 million in prescriptions, with corresponding insurer payments (primarily Medicaid, Medicaid Managed Care Organizations, and Part D Sponsors) of only $775,000, resulting in an on paper loss of more than $500,000 for a single month. Of course, the reality is that there was no loss whatsoever to AC Pharmacy for the month; to the contrary, its profits were extraordinary based on what it really spent on prescription costs, as it only dispensed a portion of the prescriptions for which it claimed reimbursement. In Relator's estimation, as many as 40% to 50% of the prescriptions that AC Pharmacy bills are never actually dispensed to patients. The

21

labeling and other paperwork relating to these non-filled prescriptions are collected, briefly

stored (as indicated in the photograph copied above), and then destroyed by Defendants. The

actual medications that were claimed to have been dispensed are then recycled into inventory,

either to eventually be dispensed or to be reused in Defendants' scheme.

79.    Indeed, if AC Pharmacy actually purchased and dispensed prescription

medications in a manner consistent with its claim submissions to the Medicare and Medicaid

programs, then over the course of just 14 months from June, 2013, through July, 2014, AC

Pharmacy would have lost more than $8.5 million. Relator determined this by generating reports

on AC Pharmacy's MicroMerchant system, which tracked its medication costs and

reimbursements. The following chart, compiled from data that Relator obtained from AC

Pharmacy's computer system, shows AC Pharmacy's fictional losses for June, 2013, through

July, 2014, broken down by month:

| Month | Medication Costs | Insurer Reimbursement | Loss |
|---|---|---|---|
| June 2013 | $1,302,285 | $774,855 | $527,429 |
| July 2013 | $1,335,524 | $810,670 | $524,854 |
| August 2013 | $1,384,119 | $796,623 | $587,495 |
| September 2013 | $1,345,530 | $766,328 | $579,202 |
| October 2013 | $1,487,526 | $862,298 | $625,228 |
| November 2013 | $1,343,337 | $795,212 | $548,125 |
| December 2013 | $1,553,723 | $931,067 | $622,656 |
| January 2014 | $1,352,394 | $812,071 | $540,323 |
| February 2014 | $1,373,429 | $801,347 | $572,082 |
| March 2014 | $1,547,943 | $881,529 | $666,414 |
| April 2014 | $1,583,981 | $880,799 | $703,182 |
| May 2014 | $1,508,796 | $855,141 | $653,655 |
| June 2014 | $1,492,494 | $847,322 | $645,172 |
| July 2014 | $1,602,161 | $852,739 | $749,422 |
| | | Total: | $8,545,239 |

80.    No small pharmacy -- or any other small business -- could possibly sustain

such losses.

<u>Jennan Provides AC Pharmacy With Bogus Prescriptions</u>

81.    Jennan generates on a daily basis hundreds of bogus prescriptions that it sends on to be filled at AC Pharmacy. These prescriptions are sent electronically by the Jennan Defendants to AC Pharmacy, ostensibly to be dispensed to their shared patients. These prescriptions are then billed to Medicaid and Sponsors without AC Pharmacy actually dispensing to patients any of the medications indicated in the prescriptions.

82.    In order to avoid suspicion, the bogus prescriptions generated by Jennan vary by product and expense, some being for mundane and less expensive items such as multivitamins, whereas others are for big ticket items such as Procrit, a medication which can cost thousands of dollars for a single prescription and which is used for increasing red blood cells, typically given to patients with HIV, kidney failure, or who are undergoing cancer treatment.

83.    Defendants frequently submit false claims for another big ticket item -- Lidoderm patches -- a topical anesthetic patch typically used as a short term shingles treatment (in conjunction with other medications such as Valtrex). When it writes a prescription for Lidoderm, Jennan typically writes prescriptions for 60 Lidoderm Patches, with three refills. Lidoderm patches should not be used for extended periods of time, given the risk of serious skin sensitivity and cardiac irregularities, yet Jennan would routinely renew the Lidoderm prescriptions for longer periods -- provided the costs for doing so was covered by insurance, *i.e.*, Medicaid or Sponsors.

84.    From January 1, 2014, through September 30, 2014, for example, based on claims made to Medicaid and Sponsors, AC Pharmacy presumably processed an astounding 1,472 prescriptions of Lidoderm patches for a total cost of $779,108 -- a rate that would amount

to approximately $1,040,000 in Lidoderm patch dispensings for 2014. To put this in context, such dispensings -- from a 400 square foot pharmacy in Sunset Park -- would amount to nearly 1% of all annual Lidoderm sales in the entire United States.

85.    Another big ticket item used by Defendants to fleece Medicaid and Sponsors is Viread, an expensive brand-name treatment for hepatitis B or HIV. A single phony prescription for this drug can mean thousands of dollars in revenue for Defendants. On January 8, 2014, the same arctic day when AC Pharmacy claimed to fill more than a thousand prescriptions, AC Pharmacy billed more than $10,000 worth of Viread to Medicaid and Sponsors.

86.    Relator directly witnessed AC Pharmacy employees billing prescriptions that were never picked up by patients, claims for which were never reversed. In some instances, Relator managed to obtain documentary proof of the fraud, by taking from the stack of to-be-discarded labels evidence that the prescriptions had been billed. Frequently, the labels were crossed through with a pen or marker, to indicate to the technicians responsible for distributing the medications to patients that the prescriptions corresponding to the crossed through labels were not to be actually dispensed.

87.    On the morning of September 20, 2013, Relator arrived early to open AC Pharmacy. As he was alone, he ran a report on AC Pharmacy's computer (surreptitiously, particularly in light of the eight surveillance cameras on the premises) to show those prescriptions that were submitted for reimbursement, but not picked up by patients. He was astonished by what occurred: AC Pharmacy's printer eventually ran out of paper -- after 273 pages of prescriptions (each page containing approximately 38 prescriptions) printed. Some of

these prescriptions were nearly five years old, and yet still never picked up by patients. Among

these prescriptions that were billed and never picked up, were the following:

- Four months' worth of prescriptions for Patient 1[1], including Isosorbide Mononitrate, Plavix, Atenolol, Diovan, Actonel, and Simvastatin. Each of these six medications were prescribed with three refills. Each of the refills was billed within 25 days to Sponsor WHP (WellCare). None were ever picked up by the patient and the charges to WHP (WellCare) never reversed. In total, WellCare paid more than $1,300 for prescriptions Defendants claimed to have dispensed to this patient, yet never actually did so;

- Four months' worth of prescriptions for Patient 2, including Enalapril, Atenolol, and Loperamine, billed to Sponsor/PBM ANT between November, 2008, and January, 2009. These included four refills, none of which were actually dispensed to the patient for Enalapril and Atenolol. These four year old prescriptions had been billed and never reversed to Sponsor/PBM ANT;

- Three patients sharing a last name and telephone number, Patient 3, Patient 4, and Patient 5, had 45 prescriptions purportedly dispensed to them, billed to Sponsor/PBM CRK, and never picked up, in just the four months from November, 2008, and February, 2009. These charges were never reversed;

- Patient 6 had multiple refills for Loratadine, Nasonex, Fluocinonide, and Pataday, which were billed to Medicaid between June and July, 2010, and not picked up as of September 2013. These medications were never dispensed to the patient and the charges to Medicaid never reversed; and

- Patient 7 had multiple refills for Minoxidil, Spironolactone, Labetalol, Gemfibrozil, and Lisinopril, which Defendants billed to Sponsor/PBM AC1 (Caremark) in October, 2011. None were picked up by the patient, yet Defendants again billed Sponsor/PBM AC1 (Caremark) in November, 2011, for these same drugs, which also were never picked up. These charges were never reversed.

        88.    Further evidence adduced by Relator of Defendants' systematic fraudulent

billings -- of bogus prescriptions alone -- is overwhelming. For example:

- On July 2, 2014, Jennan generated a new Cialis prescription for Patient 8, who resided in Staten Island, and sent the prescription electronically to AC Pharmacy. At the time, the patient already had a prescription for Cialis on file at AC Pharmacy and this prescription still had one refill left on it at the time the new prescription was generated. The new prescription was unnecessary and was generated for billing purposes only. None of these prescriptions were actually provided to the patient, yet all were billed to the Sponsor of the patient's plan, WHP2 (WellCare), and never reversed;

---

[1] Actual names of patients have been removed or redacted herein for privacy purposes.

- On October 12, 2014, AC Pharmacy purported to fill a prescription for an injectable of "Procrit" for Patient 9, billing the prescription to Billing Code "AC1" (CVS Caremark) in the amount of $3,490.79. The prescription is annotated with "0/0", meaning that the medication was out of stock and cannot be dispensed. Further, AC Pharmacy noted on the prescription, in Chinese, that the patient "is temporarily off the injection of this medication". Despite never dispensing this medication, AC Pharmacy never reversed the charge to the insurer;

- On October 24, 2014, AC Pharmacy billed, but did not fill, a prescription for Zovirax. The medication was never dispensed and Relator recovered the crossed out label. However, AC Pharmacy billed ADV1 (Caremark) more than $600 for the prescription, which claim was never reversed;

- On November 9, 2014, AC Pharmacy filled a prescription of Forteo for Patient 10. The patient's plan Sponsor/PBM ADV1 (Caremark) was billed more than $1,500 for the medication, but it was never dispensed. Relator discovered the crossed out label, which had been annotated with the word "ND [not dispensed] no longer on". This was the first fill of the prescription, with five refills yet to be dispensed. This medication was billed to the Sponsor six times, generating more than $9,000 in illicit profits, none of which dispensing was reversed;

- On February 15, 2015, AC Pharmacy billed a prescription of Forteo for Patient 11. This medication was never dispensed, the label crossed out, and on the back noted that patient was no longer on the medication. This medication was billed to Sponsor/PBM ADV1 (Caremark), as was its refill, and such claims were never reversed;

- On March 11, 2015, AC Pharmacy purported to fill prescriptions of Triamcinolone and Clobetasol for Patient 12, billing the Sponsor/PBM OP1 more than $250. These medications were never actually dispensed to the patient, and the crossed out labels were recovered by Relator;

- On March 13, 2015, Jennan generated prescriptions for Patient 13 for eight different medications, Lidocaine, Namenda, Donepezil, Simvastatin, Aspirin, Losartan Potassium, a multivitamin, and Alendronate. The prescriptions were submitted electronically to AC Pharmacy. However, the prescriptions could not be filled until April 2, 2015, because there was already an existing prescription on file for these medications providing for refills. Again, the new prescription was generated for billing purposes only. None of these medications were actually dispensed to the patient, as Relator discovered when he found the unused labels. Despite never actually dispensing the medication, all were charged to Sponsor/PBM ADV1 (Caremark) and never reversed;

- On March 25, 2015, prescriptions were billed for Patient 14, who was on a plan Sponsored by WHP2 (WellCare), Patient 15, who was on a plan with Sponsor/PBM EP2, and Patient 16, who was on a plan Sponsored by WHP2 (WellCare). In each case, Relator discovered the crossed out dispensing labels. These charges, too, were never reversed;

26

- On April 1, 2015, AC Pharmacy filled a prescription of Isoniazid for Patient 17. Relator recovered the unused label. The medication was billed to the patient's Sponsor/PBM, ES1 (Express Scripts), but never reversed despite not being dispensed to the patient; and

- On April 8, 2015, Jennan generated 14 prescriptions for Patient 18, for Lidoderm, Fenofibrate, Amlodipine, Exelon, Simvastatin, alcohol swabs, pen needles, Januvia, Lancet, Lisinopril, Vitamin D, Alendronate, artificial tears, and Aspirin. All prescriptions were billed to Sponsor WHP2 (WellCare), but none of them were actually dispensed. Instead, Relator discovered that the unused labels were placed aside for discarding. Despite never actually dispensing the medication, all were charged to Sponsor WHP2 (WellCare) and never reversed.

89.     At times, Defendants have lost track of all the bogus prescriptions that Jennan was writing, leading in some cases to Jennan writing duplicative false prescriptions. For example, on March 10, 2015, Defendant Dr. Yiu wrote a prescription for Patient 19 for the hepatitis medication Entecavir, with five refills. Less than a month later, on April 2, 2015, Defendant Dr. Huang wrote an identical prescription for the very same medication, with the same refills, for the same patient. The patient was covered by Sponsor/PBM AD1 (Caremark), which paid more than $1,000 for this prescription each time it was "filled".

90.     Defendants also bill Medicaid and Sponsors for medications that are not even in stock. For example, in or about August, 2014, Namenda, a drug for Alzheimer's, became generic. Defendants responded by generating prescriptions of the still branded, and thus more expensive, Namenda XR for billing purposes only, with each prescription costing Sponsors approximately $300. Relator obtained copies of crossed out labeling or labeling marked "0/0" -- meaning that AC Pharmacy did not have any stock of the medication, which was nevertheless billed to Sponsor/PBM AC1 (Caremark) and Sponsor WellCare, among others, for Patients 20-24.

### AC Pharmacy's Own Data Detail its Pervasive Fraud

91.     Relator was able to use his access to AC Pharmacy's MicroMerchant system to track the billing of prescriptions and whether the medications were actually provided to patients.

92.     Sponsors typically require that any medication not picked up by a patient within 14 days must be "reversed", with the reimbursement amounts returned to Medicaid or the Sponsors. As such, the custom and practice of pharmacies generally is to reverse any reimbursement for medications not picked up within 14 days.

93.     Using AC Pharmacy data, Relator compiled reports that show the massive extent of the fraud being perpetrated by Defendants:

- As of November 14, 2013, there were some 3,700 prescriptions billed as early as October 1, 2013, but never picked up by or for the patients on whose behalf they were billed. More than 95% of these amounts were paid for, and never reversed, by either Medicaid or Sponsors;

- As of January 18, 2014, there were 282 prescriptions billed on a single day, January 8, 2014, that had still not been picked up by patients. In total, AC Pharmacy billed more than $20,000 for these products that were never given to patients, which charges were never reversed;

- As of March 2, 2014, there were 202 prescriptions purportedly dispensed on February 14, 2014, and which Defendants had billed Sponsors and Medicaid approximately $15,000, that had never been picked up, and which had never been reversed;

- As of July 2, 2014, there were 827 prescriptions "dispensed" between June 1, 2014, and June 15, 2014, that had been billed but never picked up by the patients. This amounted to more than $45,000 billed to Medicaid and Sponsors for products that were never actually provided to the patients. These prescription charges were never reversed;

- From April 1, 2015, to April 11, 2015, in just 11 days, AC Pharmacy generated more than 1,700 prescriptions that were filled, but not picked up by the patients. More than 95% of these amounts were paid for, and never reversed, by either Medicaid or Sponsors;

- As of April 12, 2015, more than $500,000 worth of prescriptions purportedly dispensed by AC Pharmacy in March, 2015, had been billed and never picked up by patients. Almost all of the $500,000 should have been reversed back to the insurers, however, AC Pharmacy never reversed these charges and kept the proceeds from the prescriptions that it billed and never filled. More than 95% of these amounts were paid for, and never reversed, by either Medicaid or Sponsors; and

- One patient, Patient 25, had 13 prescriptions, all generated by Jennan and filled by AC Pharmacy between February 7, 2015, and March 2, 2015. On March 2, 2015, the patient picked up only one of his prescriptions, leaving the rest. None of these remaining 12 prescriptions were ever actually dispensed to the patient, and none of the charges were ever reversed. Instead, these 12 prescriptions were generated solely to bill Sponsor/PBM ADV1 (Caremark), generating more than $1,300 in unlawful profits for AC Pharmacy.

### Maggie Chen Generates Prescriptions under Dr. Chen's Name

94.     So as to not slow or stymie the progress of Defendants' scheme, Defendant Maggie Chen, in her dual role at Jennan and AC Pharmacy, regularly submits from Jennan to AC Pharmacy multiple prescriptions under Defendant Dr. Chen's name, including at times when Dr. Chen either is not working at Jennan or working elsewhere.

95.     Typically, Defendant Maggie Chen submits these prescriptions electronically from Jennan's office, using Defendant Dr. Chen's credentials. On certain days, Relator observed Defendant Maggie Chen leave AC Pharmacy and enter Jennan, only to see new prescriptions appear shortly afterward, which prescriptions were identified as written by the absent Defendant Dr. Chen.

96.     Often Defendant Maggie Chen generates these prescriptions near closing time, in an apparent effort to boost AC Pharmacy sales for the day.

97.     For example, on March 16, 2015, Relator observed Defendant Dr. Chen leaving Jennan early in the afternoon. He then observed Defendant Maggie Chen go from AC Pharmacy to Jennan, and shortly afterward observed electronic prescriptions purporting to be sent from Defendant Dr. Chen appear on AC Pharmacy's prescription system. These prescriptions included:

- 17 prescriptions for Patient 26, who resides in Staten Island, which were billed to Medicare;

- 15 prescriptions for Patient 27, which were billed to Sponsor/PBM ES1 (Express Scripts); and

- An identical set of 15 prescriptions issued minutes later to another patient, Patient 28, which were billed to Medicare.

98.    All of the above prescriptions were created solely to bill and were billed to either Medicaid, Medicaid Managed Care Organizations or Part D Sponsors without actually dispensing the subject medications.

99.    Similarly, on March 31, 2014, the Jennan computer system used to transmit electronic prescriptions was inoperable and Defendant Dr. Chen was not working. Undeterred, Defendant Maggie Chen generated a written prescription for Forteo with five refills for Patient 29. The prescription was billed to Sponsor/PBM ADV1 (Caremark) but never filled, and never reversed. Each dosage generated a $1,720.90 payment to AC Pharmacy, meaning that AC Pharmacy received more than $10,000 just from this one fraudulent prescription.

100.    On March 13, 2015, Defendant Dr. Chen was not working. On that day, Defendant Maggie Chen submitted multiple false prescriptions, including:

- A prescription of Fluocinonide for Patient 30, which was billed for $128.39 to Sponsor/PBM ADV1 (Caremark);

- A prescription of Clobetasol, for Patient 31, which was billed for $278.91 to Sponsor/PBM ADV1 (Caremark);

- A prescription of Acyclovir, for Patient 32, which was billed for $285.79 to Sponsor/PBM MHMO;

- A prescription of Lidex, for Patient 33, which was billed for $135.82 to Sponsor/PBM MHMO;

- A prescription of Fluocinonide, for Patient 33, which was billed for $238.64 to Sponsor/PBM MHMO;

- A prescription of Zovirax, for Patient 34, which was billed for $285.79 to Sponsor/PBM MHMO;

- A prescription of Mucinex DM, for Patient 35, which was billed for $19.84 to Medicaid; and

- A prescription of Zovirax, for Patient 36, which was billed for $674.24 to Sponsor/PBM ADV1 (Caremark).

101.    In each of the above cases, the prescriptions were purportedly written by Defendant Dr. Chen on a day when he was not even in the office.  In each case, Relator discovered corresponding crossed out dispensing labels, indicating that the medicines were never provided to patients.  In total, on a single day, and including only those medications with a corresponding crossed out dispensing label that Relator could identify without himself being discovered by Defendants, Defendants defrauded government programs out of more than $2,000 -- which as described herein is but a small part of the daily fraud that occurs at AC Pharmacy and Jennan.

102.    Other evidence compiled by Relator shows further examples of the extensive fraud being perpetrated by Defendants:

- On October 8, 2014, AC Pharmacy gave two cases of Ensure to Patient 37.  To remind herself to create fraudulent billing to offset these costs (approximately $72), Defendant Maggie Chen wrote a note to herself, recovered by Relator, telling her to create fake prescriptions for Nasonex and Pataday, costing approximately $300.

- On March 30, 2015, Defendant Maggie Chen generated a false prescription for Ambien, a controlled substance, using Defendant Dr. Chen's prescription pad;

- On March 31, 2015, Jennan created a prescription for Restasis for Patient 38 with three refills.  The prescription was generated using Defendant Dr. Chen's name from Jennan's office on 59th Street.  However, Defendant Dr. Chen was not working at that office on that day.  This prescription was never actually dispensed and created solely for the purpose of billing WHP2 (WellCare), and never reversed.  Each false filling of this prescription generated more than $167 to AC Pharmacy, totaling more than $650 in illegal profits;

- On April 16, 2015, at 5:08 PM, Defendant Maggie Chen generated a prescription for Triamcinolone, a common medication that would not arouse suspicion, for Patient 39.  This was a bogus prescription generated for the sole purpose of billing Medicaid;

- On April 22, 2015, Jennan generated seven prescriptions for Patient 40, for Artificial Tears, Loratadine, Ketotifen Fumarate, Fluticasone, and Benzonatate.  These seven prescriptions were all written by Defendant Maggie Chen using Defendant Dr. Chen's credentials.  Each was billed to the Sponsor/PBM AC1 (Caremark), but never dispensed

to the patient. Instead the labels created for these prescriptions were discarded. None of these seven prescriptions were reversed;

- Also on April 22, 2015, Jennan generated four prescriptions for Patient 41 for Artificial Tears, Nasonex, Patanol, and Tessalon. These prescriptions were billed to the patient's plan Sponsor, never dispensed and never reversed. In return for the patient's cooperation, he was given two cases of Ensure. Again, Defendant Maggie Chen was so bold as to write down her intentions to create fraudulent prescriptions, this time on the prescription itself;

- On March 6, 2015, the computer system used to transmit electronic prescriptions from Jennan to AC Pharmacy was inoperable. Undeterred by this technical glitch in Defendants' scheme, and notwithstanding that Defendant Dr. Chen was not working that day, Defendant Maggie Chen continued to submit bogus prescriptions under Defendant Dr. Chen's name by means of Defendant Dr. Chen's prescription pad, forging his signature in the process. Defendant Maggie Chen facilitated the submission of these fraudulent claims efficiently; in a 14 minute period between 4:14 p.m. and 4:28 p.m., for example, she generated no fewer than 40 prescriptions: 14 prescription for Patient 42, 9 prescriptions for Patient 43, 8 prescriptions for Patient 44, and 9 prescriptions for Patient 45. These prescriptions were billed, the medications never dispensed and the charges not reversed;

- Again, on April 8, 2015, the Jennan computer system used to transmit electronic prescriptions was inoperable, and, again, Defendant Dr. Chen was not working. Once more Defendant Maggie Chen generated false prescriptions using Defendant Dr. Chen's name and prescription pad, forging his signature. These prescriptions included fraudulent prescriptions for Patients 46-53. These prescriptions were made in order to submit fraudulent claims for medications that were never dispensed and the claims for them never reversed;

- For one of the patients, Patient 51, Defendant Maggie Chen generated multiple prescriptions for Nexium. One of these prescriptions was billed to Sponsor WHP2 (WellCare) and never filled, as evidenced by crossed out dispensing label recovered by Relator, and was never reversed, generating $698.86 in illegal profits; and

- Likewise, a prescription of Lidoderm for Patient 46 was billed to Sponsor WHP2 (WellCare) and never dispensed to the patient, and was never reversed. The label for this prescription was also found by Relator having been crossed out. This one prescription generated $591.24 in illicit profits for AC Pharmacy.

103. AC Pharmacy has even obtained old, unused prescription pads from

Jennan, with Jennan's prior address on them, and maintains these prescription pads on hand so

that Defendants can handwrite additional bogus prescriptions on an ad hoc basis. A copy of one

of the blank prescription slips, that Relator recovered from a pad stored at AC Pharmacy and used by Defendants, is pictured (with highlighting supplied) below:



104. Using these blank prescription pads, between August and October, 2013, alone, Defendants created 12 bogus prescriptions for Lidoderm patches, for 12 different patients: Patients 54-65. These prescriptions were created -- and used -- solely for billing purposes, to fleece Medicaid and Sponsors out of thousands of dollars.

105.    Defendants also use these prescription pads to create fraudulent prescriptions for controlled substances, including using one such pad to create a prescription for Ambien for Patient 66 on August 6, 2013.

106.    Jennan even generated more than 100 prescriptions for Defendant Maggie Chen -- in her individual capacity as a Medicaid recipient -- in little more than 13 months, from January 8, 2014, through February 11, 2015, using one of her aliases, Patient 67. These prescriptions were likely never dispensed and never reversed; rather, these prescriptions were billed to Medicaid directly and to Sponsors.

107.    In an attempt to conceal their activities, Defendants would commit the bulk of their fraud on days when Relator was not working, such as January 8, 2014, and December 15, 2014. To diffuse suspicion, Defendants would, on occasion, wait until a day when Relator was working to print out the labeling on the already billed prescriptions, so that AC Pharmacy's computer systems would associate Relator with the phony prescriptions. Defendants did so in an attempt to conceal and dissociate themselves from their illegal conduct.

### Jennan Generates Prescriptions at an Impossible Rate

108.    In order to generate as many fraudulent transaction as possible, the Jennan Defendants -- the doctors and nurse practitioners -- write false or unnecessary prescriptions at a furious rate.

109.    For example, on April 13, 2015, Defendant Dr. Chen generated more than 180 prescriptions for AC Pharmacy -- nearly half the prescriptions purportedly filled at AC Pharmacy that day. It is clear from the prescription log maintained by AC Pharmacy that these prescriptions cannot have resulted from the provision of legitimate medical services. Indeed, during this one day, in order for Dr. Chen to have properly treated and written legitimate prescriptions for patients allegedly seen, he would have had to have worked at staggering speeds:

- From 11:11 a.m. to 11:16 a.m., Defendant Dr. Chen would have met with two patients in a five minute span;

- At 11:34 a.m., Defendant Dr. Chen would have treated two patients during the same minute;

- From 12:46 p.m. to 12:50 p.m., Defendant Dr. Chen presumably examined and wrote prescriptions for three patients in five minutes;

- From 1:10 p.m. to 1:33 p.m., Dr. Chen would have seen six patients in 23 minutes;

- From 2:44 p.m. to 3:28 p.m., Dr. Chen would have seen eight patients in 44 minutes; and

- From 5:47 p.m. to 6:11 p.m., Dr. Chen would have seen seven patients in 23 minutes.

110.    There is simply no way in which Defendant Dr. Chen could have seen, examined and written prescriptions for all of these patients as quickly as claimed.

111.    On April 8, 2015, Defendant Dr. Yiu performed similar miraculous feats, including:

- At 10:34 a.m., prescribing medications for two patients in two minutes;

- From 10:34 a.m. to 11:02 a.m., prescribing medications for another three patients;

- From 12:43 p.m. to 1:15 p.m., prescribing medications for six patients in little more than half an hour; and

- At 1:58 p.m., prescribing medications for two patients in three minutes.

112.    Numerous other examples exist.  On March 19, 2015, Defendant Dr. Chen purported to see and prescribed Prolia injections for eight different patients over the course of just 12 minutes.  Combined, these prescriptions cost the Sponsors for these patients alone nearly $10,000, including refills.

Nurse Practitioners at Jennan Falsely Claim to be Medical Doctors

113.    Each of the nurse practitioners at Jennan, Defendants Pui-Ching Mak, Qing Xiang Huang and Xing Lian Chen, routinely hold themselves out as medical doctors on Jennan's Chinese language business cards.  Moreover, each of them write prescriptions in which

35

they falsely represent themselves to be medical doctors for claims submitted directly to

Medicaid, Medicaid Managed Care Organizations, and Part D Sponsors in blatant contravention

of applicable law. Accordingly, each prescription so written by these Defendants is unlawful and

when knowingly submitted by AC Pharmacy for payment by the Medicare or Medicaid

programs constitutes a false claim.

114.    Relator has compiled compelling evidence of this unlawful practice:

- On March 6, 2014, Defendant Xing Lian Chen wrote prescriptions for four different patients, portraying herself as a medical doctor on the prescription by identifying herself as "Dr. Xing Lian Chen" on each;

- On November 9, 2014, Defendant Huang wrote a prescription for Zovirax for Patient 68, portraying herself as a medical doctor on the prescription by identifying herself as "Dr. Qing Huang". This prescription was billed to AD1 (Caremark);

- On March 16, 2015, Defendant Mak wrote 13 prescriptions for Patient 69 for Multivitamins, Ventolin HFA, ProAir HFA, Claritin, Ranitidine, Zocor, Claritin, Claritin RediTabs, Tylenol, Robitussin, Singular, Calcium, Fosamax, and Nexium, each time portraying herself as a medical doctor on the prescriptions. Two prescriptions, Ventolin HFA and ProAir HFA, were for the same medication, but made by different manufacturers. These prescriptions were billed to Medicaid. In each prescription, Defendant Mak passed herself off as "Dr. Pui-Ching Mak";

- Also on March 16, 2015, Defendant Mak wrote four prescriptions for Patient 70, for Lansoprazole, Ampicillin, Clarithromycin, and Omeprazole. These prescriptions were billed to Sponsor/PBM ADV1 (Caremark). In each prescription, Defendant Mak passed herself off as "Dr. Pui-Ching Mak"; and

- On March 30, 2015, Defendant Mak wrote four prescriptions for Patient 71, for Clobetasol, Ammonium Lactate, Claritin, and Calcipotriene, each time portraying himself as a medical doctor on the prescriptions. These prescriptions were billed to the patient's plan Sponsor/PBM ADV1 (Caremark). In each prescription, Defendant Mak passed herself off as "Dr. Pui-Ching Mak".

### Jennan's Prescribing of Unnecessary and Dangerous Medications

115.    Many of the bogus prescriptions Jennan generates are for treatments that

are not medically necessary. In some cases that Relator has observed, the prescribed quantities

of pharmaceuticals would have actually been dangerous, had the patients actually used all of the

medications prescribed to them. However, these medications were never actually dispensed to the patients. For example:

- Patient 72 was prescribed Santyl, an anti-scarring and debriding ointment. The prescription was for a 60 day supply, with three refills, which amounted to an eight month supply of the ointment. There is no medically justified reason for a patient to be on this medication for eight months. Only the first prescription was actually dispensed to the patient, with the refills being submitted for billing purposes only. The patient's plan Sponsor/PBM, ADV1 (Caremark), was billed more than $750 each time;

- Patient 73 received six different inhalation medications and three other prescriptions over the course of 20 days, from five different prescribers at Jennan. There is no medically justified reason for these prescriptions. The only logical reason to prescribe so many medications was to allow AC Pharmacy to bill the patient's plan Sponsor/PBM, HUM2 (Humana), while only dispensing part of the medication to the patient;

- Jennan regularly prescribed medications used to treat glaucoma. It did so despite not having the appropriate equipment or training to diagnosis glaucoma. For example, Patient 74 was prescribed the glaucoma medication Lumigan on January 16, 2015. The order was not filled until March 5, 2015. This prescription was generated solely to bill the patient's plan Sponsor, WHP2 (WellCare), which paid out more than $250 each time it was "dispensed"; and

- In ten days, between February 5, 2015, and February 15, 2015, Jennan generated five separate prescriptions for the largest quantity of Clobetasol marketed for five separate patients. These prescriptions were billed to Sponsors/PBMs AD1 (Caremark) and ES1 (Express Scripts), each of which paid more than $250 for each prescription. These prescriptions were never actually dispensed and done purely for billing purposes.

<u>Jennan's Use of "Short Fills" to Increase Fictional Dispensings</u>

116.    In order to increase its revenue, AC Pharmacy routinely bills Sponsors for refills at the earliest possible time. Because many Sponsors allow for refills to be billed somewhat in advance of a patient's having used up the prior months' supply of medication, Defendants are able to obtain additional billings for medications that are dispensed.

117.    Indeed, many plans allow for refills of monthly medications to be billed after 25 days. By automatically billing medications each 25 days, AC Pharmacy is able to obtain two additional billings for each year that it holds a patient's prescription. Examples of this include:

- Patient 75 who resided in Flushing, approximately two hours away (by public transportation) from AC Pharmacy, had prescriptions for Viread, a treatment for hepatitis B or HIV, and Exelon, a treatment for Alzheimer's. The Viread prescription was filled on September 23, 2014, October 16, 2014, and November 10, 2014 -- every twenty-five days. The Exelon prescription was filled on October 17, 2014, November 10, 2014, December 4, 2014, and December 29, 2014 -- again within 25 days each time;

- Patient 76 received a refillable prescription of Forteo. The initial prescription was filled on November 5, 2014. On December 1, 2014, exactly 25 days later, the prescription was refilled; and

- On February 15, 2015, AC Pharmacy filled a prescription of Atelvia for Patient 77. The prescription was not picked up until March 25, 2015, when the patient came to pick up both this prescription and the subsequent refill of the same medication, more than a month after the initial refill was billed.

<u>AC Pharmacy Compensates Jennan for False Prescriptions</u>

118.    AC Pharmacy compensates Jennan for its participation in the fraudulent scheme by, among other things, providing it with various prescription medications that were billed to other patients' insurers.

119.    Relator regularly witnessed injectable prescription medications being provided to Jennan purportedly on behalf of patients where the dosages and quantity far exceeded the amount that would have been medically necessary or reasonable for such patients. These medications are used by Jennan with multiple patients, who either pay cash for the extra dosages not used by the billed-for patient, or for other patients, for whom Jennan generates additional prescriptions for billing purposes only. Relator managed to obtain copies of Jennan's receipts for two patients, Patient 78 and Patient 79, in which Jennan billed Patient 78 $20 for a Vitamin B12 injection and Patient 79 $20 for a Kenalog injection, which medications were actually originally paid for by billing Medicaid and/or Sponsors.

120.    For example, on March 3, 2015, Dr. Chen prescribed Patient 25 with ten doses of Ceftriaxone, which were billed to ADV1. However, only one dose was for this patient with the remaining doses being were being kept by Jennan for use with other patients.

Defendants Orchestrate "Reimbursements" by WellCare for
OTC Purchases Never Made

121.     From April 1, 2014, to at least in or about January 2015, AC Pharmacy

conspired with WellCare representative, Defendant Jacky Lee, to submit fraudulent invoices to

WellCare for fictitious purchases of over-the-counter products, as follows:

122.     WellCare offers an "OTC Card" to its participating Medicare Plan D

beneficiaries that provides for purchases of up to $80 each month in over-the-counter

medications. Alternatively, WellCare beneficiaries can submit monthly invoices for

reimbursement up to this $80 amount for instances when the patient's pharmacy would not honor

the OTC Card.

123.     Given its small size, AC Pharmacy carries few OTC items for sale to its

patients. This physical limitation, however, was no bar to Defendants bribing patients to fill their

prescriptions at AC Pharmacy.

124.     Defendants conspired with WellCare representative, Defendant Jacky Lee,

to provide WellCare patients with "reimbursements" for fictitious OTC purchases at AC

Pharmacy. This was accomplished by having patients give their WellCare OTC debit card to AC

Pharmacy and sign a blank monthly claim form. Defendants would then fill out the claim form

with bogus purchases and provide these completed and signed forms to Defendant Jacky Lee,

who would in turn submit these to WellCare for reimbursement, along with fraudulent receipts

generated by AC Pharmacy. WellCare would then send an $80 check directly to each patient, to

"reimburse" that patient for what were in reality falsified purchases.

125.     So widespread was AC Pharmacy's practice of submitting false invoices

to WellCare that it created 14 different templates to be used to create false invoices for this

purpose. Notably, each template contained exactly four products, with all prices being even

dollar amounts, with the total cost of these purely fictitious products being between $80 and $90.

126.    Similarly, the receipts fraudulently generated by AC Pharmacy were all

created showing items priced at even dollar amounts and in just enough quantity to fully exhaust

the patient's reimbursement amounts.

127.    Accordingly, and by way of example:

- In or about November, 2014, Defendants submitted a false reimbursement form on behalf of Patient 81 to WellCare for $80 worth of products never sold to the patient. Included in list of products allegedly purchased was $15 of "Fibertab Tablets". AC Pharmacy did not carry this product;

- In or about November, 2014, Defendants submitted a false reimbursement form on behalf of Patient 82 to WellCare for $80 worth of products never sold to the patient. The list of products allegedly purchased was identical to those 'purchased' by Patient 81, including the $15 of "Fibertab Tablets" that AC Pharmacy did not carry;

- Patient 83 even sent a fax to AC Pharmacy complaining that he was missing his fraudulently obtained reimbursement check from WellCare. The second page of the fax indicates that he received a check for $80 representing "re-imbursement" for September 2014; and

- Defendants regularly wrote notes to Defendant Lee to inquire about patients who had complained to AC Pharmacy about not receiving their monthly OTC benefit check.

128.    The WellCare card scheme proved so popular with patients participating

in such numbers that Defendant Jacky Lee became apprehensive that he would be caught.

Indeed, in or about January 2015, he refused to continue to submit further false claims to

WellCare and this particular scheme appears to have concluded.

**Defendants Provide other Illegal Kickbacks to Patients**

Cash "Coupons"

129.    After Defendant Jacky Lee refused to continue to perpetrate the fraudulent

WellCare card scheme, AC Pharmacy re-tooled and began distributing "coupons" that can be

used by patients to purchase products from a local supermarket.

130.    These "coupons" are issued by New York Mart 8 Avenue Inc. ("New York Mart"), which operates a supermarket three blocks from AC Pharmacy. Each coupon has a $2 face amount that can be spent on any product sold by the supermarket -- effectively making the coupons cash. An image of one of these coupons is below:



131.    AC Pharmacy and Jennan purchase from New York Mart thousands of dollars of these coupons each month to distribute to their patients.

132.    Unlike the scheme with WellCare, Defendants' coupon scheme is open to any patient with an over the counter benefit card issued by a Part D Sponsor or Medicaid Managed Care Plan, such as the WellCare "OTC Card".

133.    This scheme is perpetrated as follows: Patients first turn over to AC Pharmacy the debit card issued to them by their Part D Sponsor or Medicaid Managed Care Plan.

134.    Subsequently, each month, when patients visit AC Pharmacy to refill prescriptions, AC Pharmacy gives the patients a month's-worth of coupons. Depending on the OTC plan, AC Pharmacy gives patients up to $112.50 in coupons each month to be used at New York Mart. Again, apparently unconcerned at the extraordinary record it is making of its illegal conduct, when AC Pharmacy distributes the coupons to the patients, it has the patients acknowledge in writing that they have received their coupons.

135.    In certain instances, AC Pharmacy uses patients' individual debit cards to make OTC purchases at other pharmacies to recoup part of the expense of the coupons. For example, on Sunday, March 29, 2015, AC Pharmacy employees used a customer's OTC card to purchase a blood pressure machine from Rite-Aid.

136.    According to AC Pharmacy data, compiled by Relator, between January 1, 2015, and March 7, 2015, alone, AC Pharmacy purchased and distributed to its patients more than $27,805 in these coupons.

137.    Defendants purchased from New York Mart $10,500 worth of these coupons on January 14, 2015. AC Pharmacy took $10,000 of them to give out to patients filling prescriptions. The remaining $500 were given to Defendant Maggie Chen, to be distributed to patients at Jennan.

Illegal Kickbacks in Other Forms

138.    Defendants routinely provide kickbacks and unlawful inducements to patients in other forms to have them fill their prescriptions at AC Pharmacy, all in blatant contravention of the Anti-Kickback statute, thereby rendering any such prescriptions submitted to the Medicare or Medicaid programs false. Moreover, many of these kickbacks and inducements are paid for by Defendants' further fraud against the government.

139.    Defendants regularly assist patients in obtaining medications not covered by their Medicaid or Medicare plans by providing them the uncovered medications and then billing Medicaid or Medicare for fictitious prescriptions (of a kind covered under their respective plans), often billing Medicaid or Medicare in amounts far above the cost of the prescriptions actually dispensed to the patients.

140.    Under this scheme, a patient approaches Defendants seeking a medication not covered by his or her particular plan. Jennan generates prescriptions for the sought after

medication as well as additional bogus prescriptions for the same patient for medications that AC

Pharmacy then bills -- but doesn't dispense -- to Medicare and Medicaid. Jennan transmits the

prescriptions to AC Pharmacy, which dispenses to the patient the uncovered medication,

typically for free. AC Pharmacy then recoups its investment -- and then some -- by billing that

patient's insurer, either Medicaid, a Medicaid Managed Care Plan, or a Sponsor, for a number of

fictitious prescriptions that AC Pharmacy has never dispensed.

141.    The patient thus obtains the uncovered medication he or she seeks,

typically at no cost; Defendants not only recoup any expense but profit from billing other, bogus

prescriptions that are never filled, and, further, secures the patient's loyalty, thereby enabling

Defendants to continue to make additional false claims against the patient's insurer; and the

government gets stuck with the bill for all of the bogus prescriptions billed under the patient's

name to Medicaid, Medicaid Managed Care Plans, or Sponsors.

142.    Relator obtained evidence of such fraudulent conduct having occurred on

multiple occasions:

- On March 1, 2015, Patient 84 was prescribed Lidoderm 5% patch, Renvela, Welchol, and on March 11, 2015, Eliquis. None of these were covered by the patient's healthcare plan. To cover the costs of providing these medications to the patient, AC Pharmacy and Jennan generated a false prescription for Procrit 20000 Unit/ML on April 13, 2015, which was billed to Sponsor/PBM ADV1 (Caremark) for $1,798.64. The prescription was never actually dispensed, as noted by Relator when he discovered the unused label for the prescription, and was never reversed; and

- On September 3, 2014, Patient 85 requested and received a Lidoderm Patch not covered by her plan. To cover the cost of the patch, Jennan created a false prescription for Lidocaine ointment, which AC Pharmacy billed to the Sponsor/PBM ADV1 (Caremark), but never dispensed, and which was never reversed.

143.    Defendants also provide a variety of other inducements and kickbacks to

patients, including:

- During the four-week period between January 26, 2015, through February 16, 2015, AC Pharmacy paid $629.60 to Sing Tao Newspapers, the publisher of a Chinese language

newspaper, for more than 1,000 newspapers to distribute to patients, as yet another incentive to keep these patients patronizing AC Pharmacy; and

- During the period January through May of 2013, AC Pharmacy distributed free disposable gloves, diapers, bandages and other products to patients. AC Pharmacy then submitted claims for reimbursement of these products to the Sponsors and Medicaid. Defendant Maggie Chen generated dozens of false written prescriptions, using Defendant Dr. Chen's credentials for these items. Defendant Florence Mui generated a written list indicating all such items distributed and to whom they were distributed during this period which Relator has obtained.

144.    The Jennan Defendants were aware of and actively participated in AC Pharmacies' illegal kickbacks and bribes to patients. In fact, Jennan has actively participated in the illegal bribe and kickback schemes by writing additional prescriptions to offset the costs of the products, gifts, and payments made to patients. For example, during the period January, 2013, through May, 2013, Jennan wrote prescriptions to cover the cost of the free medical supplies dispensed to patients as an inducement to patronize Jennan and AC Pharmacy, and to keep quiet about Defendants' fraudulent claims to Medicaid, Medicare and the Sponsors.

## **Defendants Receive Illegal Kick-Backs from its Suppliers**

145.    To maximize their ill-gotten gains, Defendants (other than Defendants Shadrin and Lee) routinely seek and receive illegal kickbacks from suppliers to which they steer dispensings of certain products that AC Pharmacy does not carry.

146.    For example, Defendant Shadrin was employed by MA Surgical Supplies and Caremore Consulting at relevant times, and in that capacity, provided durable medical equipment and supplies to AC Pharmacy's and Jennan's patients, such as wheelchairs and other large products that could not otherwise be stored or displayed in AC Pharmacy's small space. To induce other Defendants to place orders through him, Defendant Shadrin paid a 15% kickback to other Defendants on products provided for AC Pharmacy's and Jennan's patients. Specifically:

- On July 12, 2013, Jennan prescribed Patient 86 a wheelchair. AC Pharmacy subsequently ordered the wheelchair through Defendant Shadrin and earned a 15% kickback for routing the order through him; and

- On July 19, 2013, Jennan prescribed a patient a bath chair. AC Pharmacy ordered the bath chair through Defendant Shadrin and earned a 15% kickback for routing the order through him.

## THE EXTRAORDINARY DAMAGES TO THE
## MEDICARE AND MEDICAID PROGRAMS

147.    As a direct and proximate result of Defendants' fraudulent scheme whereby false claims (and otherwise improper claims, thereby rendering them false claims) were submitted to the Medicare and Medicaid programs as described above, Defendants have caused, and continue to cause, substantial damages to the Medicare and Medicaid programs for at least tens of millions of dollars to date.

### FIRST CLAIM FOR RELIEF

(Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*)

(Against all Defendants)

148.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

149.    Defendants knowingly have presented or have caused to be presented false or fraudulent claims for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

150.    Defendants knowingly have made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

151.    Defendants have conspired with each other, as well as others, to defraud the Government by getting false or fraudulent claims allowed, or paid, in violation of 31 U.S.C. § 3729(a)(1)(C).

152.    Defendants have knowingly and improperly avoided obligations to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

153.    Because of Defendants' conduct set forth in this Count, the United States has suffered actual damages in the tens of millions of dollars, with the exact amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

(New York False Claims Act, NY State Financial Law, Article 13)

(Against All Defendants)

154.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

155.    Defendants knowingly have presented or have caused to be presented false or fraudulent claims for payment or approval by the State of New York, in violation of the NY State Fin § 189(1)(a).

156.    Defendants knowingly have made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New York, in violation of NY State Fin § 189(1)(b).

157.    Defendants have conspired with each other, as well as others, to defraud the New York State Government by getting false or fraudulent claims allowed, or paid, in violation of NY State Fin § 189(1)(c).

158.    Defendants have knowingly and improperly avoided obligations to pay or transmit money to the State of New York, in violation of the New York False Claims Act, NY State Fin. Law, Art. 13.

159.     Because of Defendants' conduct set forth in this Count, the State of New York has suffered actual damages in the tens of millions of dollars, with the exact amount to be determined at trial.

160.     Based on the foregoing allegations, Defendants are liable under the New York False Claims Act, NY State Fin. Law, Art. 13.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff United States of America, through Relator, respectfully requests that the Court grant the following relief:

A.     Judgment for the United States and/or the State of New York, as applicable, against Defendants in an amount equal to three times the damages the federal and state governments have sustained because of Defendants' unlawful actions, plus such civil penalties as may be applicable;

B.     An award to Relator to the maximum extent allowed under federal and state law;

C.     Against Defendants, attorneys' fees, expenses and costs of suit; and

D.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

trial by jury in this action of all issues so triable.

Dated:  September 22, 2015
        New York, New York

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: _____

David A. Berger
John S. Craig
James R. Schiffer
Vera Zolotaryova

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Attorneys for Plaintiff*
*United States of America*
*Ex rel. Daniel Moy*